## Jacob Noble

### *v.*

### Jefferson Chrisman.

1. BOUNDARIES—*finding corners where monuments are lost.* Where the original monuments of the corners of sections in the government surveys are lost, or can not be found, and no other means of locating them can be had, the plan of pro rating along the range or other line may be resorted to, as the fairest approximation of the corners, though by no means certain; but the indications from such a process, in a case like this, are far less reliable than the circumstantial evidence found in tracing the field note course from a known section corner east or west to a point where that course intersects the range line.

2. SAME—*result of former suit between others not to be considered.* In a suit involving the original location of the north line of a section, where two corners are claimed as the original corner of the section, and the jury are incidentally informed by the witnesses of a prior suit between different parties, in which such line had been brought in question, and that it had been decided in such manner the surveyors thought it was settled that one of the corners claimed was the government corner for one township, and the other corner for the

township next west, the court should, if asked, instruct the jury not to take into consideration the result of any former suit in regard to the north line of such section, and that the verdict in such case has nothing to do with the issues before them.

3. SAME—*declarations of persons acquainted as to original corners, as evidence.* The declarations of persons who have since died, but who had peculiarly good means of knowledge on the subject, made when they had no interest in misrepresenting the truth, on questions of land marks and boundaries, or as to the place of a government corner, are admissible as evidence on the question. Such declarations, made by a person owning a tract affected by the question before any improvements were put upon the adjoining lands, are admissible, it not being material to his interest whether the line is a little further north or south in such case.

4. SAME—*estoppel by acquiescence.* In a contest as to the true boundary line east and west between two quarters of land, where it appears that the defendant, as the owner of the south quarter, first improved the same, if, at the time he built his north line of fence, there was then a *controversy* as to which of two corners was the true one, then, so far as the question of estoppel is concerned, to find for the defendant is erroneous.

5. ESTOPPEL—*when it arises, and from what.* An estoppel *in pais* rests upon the act of the party to be estopped, or some omission on his part to speak or act, by which some supposed right of another seems to be waived, or in a case and under circumstances where some other party acts upon the faith of such act or omission, and changes his condition. It rests, in all cases, upon the fact that, under the circumstances, the party to be estopped ought to have acted differently, if he did not intend to waive his right.

APPEAL from the Circuit Court of McLean county.

Messrs. ROWELL & HAMILTON, for the appellant.

Messrs. STEVENSON & EWING, and Messrs. KARR & KARR, for the appellee.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

This is an action of ejectment, brought, in 1872, by Chrisman, to recover from defendant, Noble, a strip of land then in his possession, and which he had inclosed in his fenced lands as early as 1858, but which plaintiff now claims is a part of his land, adjoining defendant's land.

Plaintiff, it is conceded, is the owner of the north-west

quarter of section 19, in township 22 north of range 2 east of the third principal meridian, and it is admitted that defendant is the owner of the quarter section of land adjoining plaintiff's land on the south line thereof, being the south-west quarter of this same section 19.   In 1856 defendant took possession of his land, fenced part of it that year, finished his fencing the next year, placing the fence for his north boundary where it now stands.   A public road had been established along this quarter section line, and, in fencing, defendant left out a proper width of land for one-half of the road.   Within a year or two, defendant planted an orchard near his north fence, and built his house so near to the road that, should plaintiff recover the land in controversy, it will take from defendant two rows of apple trees, and leave his house very near to his north line.   At the time when these improvements were made, the land of plaintiff was owned by one Paswaters, from whom plaintiff subsequently, and since 1865, has acquired title. These improvements of defendant were made with the knowledge of Paswaters, and without objection by him.   Not only so, but about the time when defendant was planting his orchard and building his house, Paswaters took possession of what is now plaintiff's tract of land, and built his fence for his south boundary, in conformity to the line adopted by defendant.   At first he did not leave out space enough for the road, but afterward, in 1865, his tenant, by his direction, moved this fence back, so as to leave a lane.   Thus the boundary fences, and the road between these tracts, remained and were kept up until the bringing of this action.

In this action, plaintiff claims that the quarter section corner, at the west end of the boundary between his land and that of defendant, should be one chain and forty-one links farther south than the point where the present boundary between them intersects the range line, and that the east end of this boundary should be placed seventy links south of its present location.

Judgment in the circuit court was rendered for the plaintiff,

and defendant brings the case here by appeal, and insists that the court erred in improperly limiting the legal effect to be given to certain parts of the testimony, and in the giving of certain instructions, and in the refusal to give others, and also insists that the verdict was so palpably against the weight of the evidence, that his motion for a new trial ought to have been allowed.

The proper determination of the questions thus presented, involves an examination of the evidence, direct and circumstantial, bearing upon the issue.

The public lands in McLean county were surveyed by the government in the year 1823. By the plan of surveying in use at that time, no government monument was required to be erected at the west end of the line, between these two quarter sections, nor is there any direct evidence in the case tending to show the location of the corresponding quarter section corner, at the middle of the east line of section 24, lying immediately west of this section. The claim of plaintiff rests upon the hypothesis that a mistaken notion had prevailed as to the true location of the section corner for the north-west corner of this section, and that the present line between these two quarters of this section was (by reason of the mistake as to the section corner) located in the wrong place. This township 22 north, range 2 east, in which this section 19 lies, is called Randolph township, and the township lying adjoining this, on the west, is called Funk's Grove township. Section 24, in Funk's Grove, adjoins this section 19, in Randolph township. There are three points on the range line, near the north-west corner of this section 19, each of which is claimed, by one or the other party, to be the true location of an original monument for a section corner. One is called "the Halderman corner," one is called "the Noble corner," and the other may be called "the Swarts corner."

By the field notes of the government surveys of these townships, (as is usual in sections adjoining each other, and having a range line for a common boundary,) it appears that the

monument for the north-east corner of section 24 was erected two chains and twenty-six links north of the monument erected for the north-west corner of section 19. The government surveyors, therefore, ought to have erected, and the field notes show that they did erect, monuments at *two* of these points, but it is clear that *all three* of the points are not at places marked with such monuments. The Swarts corner is farthest north, the Noble corner next, and the Halderman corner is farthest south. The Swarts corner is two chains and twenty-six links *north* of the Noble corner, and the Halderman corner is one chain and seventy links *south* of the Noble corner.

The only surveyors by whom, it is alleged, indications of monuments have been seen at these several points, are four. The evidence tends to prove, that Noble saw monuments at the Noble corner, and at the Swarts corner, in 1835 and afterwards, while the original monuments were well preserved throughout the town, and that in 1851 Swarts saw monuments at the Noble corner and at the Swarts corner; that, in 1852, Folson saw a monument at the Noble corner, but could not find the Swarts corner; and that, in 1856, twenty-three years after the monuments were erected, Halderman recognized the Noble corner as a government corner, and saw, for the first time, a monument at the Halderman corner. This was twenty-three years after the government corners were erected. A few days after this, Folson, hearing of the discovery of the Halderman corner, visited it, and, on examination, could see no evidence of a monument.

Swarts and Folson gave testimony in the case. The opinions of Halderman and Noble were given by witnesses who heard them make declarations on the subject. Noble is shown to have died before this action was brought. The testimony does not show the death of Halderman, nor is any reason shown why his testimony might not have been taken. As his declarations were received without question, his death is presumed. The opinion of Halderman, that the Halderman corner was at a government monument, was fortified by four

witnesses, who were present at Halderman's survey in 1856, who thought the appearance of the ground showed a mound and a pit, and who testify, that, by digging in the mound, "a piece of rotten wood, which looked like a piece of a stake," was brought out with the second spadeful of earth. Swarts swears he found, in 1851, at the Swarts corner, a mound, a pit, and a stake in the mound.

The evidence is very satisfactory that the Noble corner is *an* original government corner. Noble, Swarts, Folson and Halderman all agree in pronouncing it a government corner. They differ in this: Noble, Swarts and Folson agree in pronouncing it *the* government corner for the north-west corner of section 19, in Randolph township; Halderman pronounced it *the* government corner for the north-east corner of section 24, in Funk's Grove township. The position of Noble, Swarts and Folson is fortified by the fact, that *all* the fences built on and near this range line, in both Funk's Grove and Randolph townships, prior to 1856, are found to be in conformity with the idea that the Noble corner is the true corner for the north-west corner of section 19, in Randolph, and the Swarts corner is the true corner for section 24, in Funk's Grove township, and by the fact that *all* the fences built *after* that date, until about 1867 or 1868, on each side of this range line, were built in conformity to the same idea, except two fences: that of Howser, for the south line of section 18, in Randolph, and that of Funk, for the north line of section 24, in Funk's Grove township.

Many of these fences must have been built at an early day, (the north line of section 20, in Randolph, was built in 1835,) when many monuments, now destroyed, were plainly visible. It is hardly probable that, in locating all these fences throughout the whole six miles, reliance was placed alone on this Noble corner. Many of the fences in the south and north parts of the towns, on each side of the range line, must have been originally located from monuments then known in their immediate vicinity, and without any reference to this Noble

corner. The fact that the location of all of them is in conformity to the Noble corner as the section corner for the north-west of section 19, and are not in conformity with the theory that the true corner of that section is at the Halderman corner, greatly fortifies the opinion of the three surveyors—that the Noble corner is the true corner for section 19.

The section corners for the sections in Funk's Grove township, which adjoin this range line, were (by the plan of surveying used by the government surveyors) established when the range line was run, and monuments were then erected for the corners of these sections. Then it was that the monument was erected at the north-east of section 24, in Funk's Grove township. After this, the townships were subdivided, and the north-west corner of section 19 was then established. In doing this, the north-west corner of section 20, in Randolph, was established, by starting at the monument, on the township line, on the south, (erected there, for the south-west corner of section 32, by the government surveyors when the public lands were run off into townships,) and running a line north, and parallel to the east line of that township, for the distance of three miles, stopping at each quarter section corner to erect a monument, and at each section corner to run east and west, and locate and mark the corners on these east and west lines. Having thus measured north, from the south-west corner of section 32, the distance of three miles, the north-west corner of section 20 was established, and a monument was there erected. After locating the north line of section 20, and erecting a monument at the quarter section corner, on the north line of that section, the surveyors then proceeded to *establish* the north-west corner of section 19, in Randolph, by running a line west (and parallel to the south line of the township) until it intersected the range line, and *there* they erected a *monument* for the north-west corner of this section, and that *without regard* to the monument before that erected for the north-east corner of section 24, in Funk's Grove. To enable those who should come after them the more readily to

determine exactly where this north-west corner for section 19 had been erected, it was their duty to measure the distance north and south between this monument and the monument already erected at the north-east corner of section 24, and record the same in the field notes. This was done in this case, and the field notes show that the monument erected for the north-west corner of section 19, in Randolph, was south of the monument erected for the north-east corner of section 24, in Funk's Grove, and at the distance of two chains and twenty-six links.

In this case, the position, that the Noble corner is the true government corner for the north-west corner of section 19, is strongly fortified from the following facts shown in the evidence: Producing the north line of section 20, from the known location of the north-west corner of the section, west, to the range line, strikes at, or very near, the Noble corner, and falls upon the range line at a point exactly *field note distance* south of a point where Swarts testifies he found, in 1851, a plain government corner—the true location of the north-west corner of section 24, if the Noble corner is the true corner for section 19. Thus, the taking of the Noble corner for the true corner for section 19, verifies the original government surveys, and conforms to the field notes of the very survey by which that corner was originally located.

The same facts repel strongly the position, that the Halderman corner is the original corner for the north-west corner of section 19; for, before the Halderman corner can be taken as the true, original location of the monument for the north-west corner of section 19, it must be believed that the government surveyors, in locating that monument and defining its location, made two mistakes, each of which was so egregious as to be without precedent in government surveying: It must first be believed that, in attempting to produce to the westward the north line of section 20, they so far mistook their course that, in running one mile, they fell one chain and seventy links too far south—a degree of error so great that, were the line thus

13—88 ILL.

continued for six miles, the departure from the true line would amount to *more than ten chains;* while it is well known that the distance between the jog section corners, on the range and town lines, never exceeds half that distance, and, usually, does not exceed two chains. Secondly, it must be believed that these government surveyors not only made this egregious blunder in running the north line of section 19, but that, having done so, they then measured the jog distance so erroneously between the corner of section 19 (so established) and the monument for the section corner next north of it, that they made it two chains and twenty-six links, when, in fact, it was only one chain and seventy links. The surveyors all testify that an error in the field notes of as much as fifty-six links, in the distance between jog corners, is unprecedented; and well may they say so. Measure a township line with the same degree of error, and it would turn out that what is put down as six miles in the field notes, would be found, on actual measurement, to be only about four miles and a half. Had the surveyors made either one of these blunders, it would have been unprecedented. That they should have made two such blunders, in locating one monument and defining its position, is hardly credible; and yet, if the Halderman corner be the true corner for section 19, they must have done so.

To fortify the Halderman corner as the government corner for section 19, the plaintiff called witnesses to show where a pro rating of the distance between known corners would place the corner if there were no monuments found, and that by that process the north-west corner of section 19 would fall south of the Halderman corner. A map is introduced, with figures along the range line, supposed to represent the length of line given to each section by that process. By that map it seems to appear that the boundary between these townships is more than six miles long, and that the excess is eight chains and twenty-nine links. This seems a very extraordinary excess, and it would seem that the pro rating calculations of three of the surveyors are based upon the figures on this map.

The testimony does not disclose by what measurement these figures were found.

Merchant, Anderson and Ela, surveyors, who were examined at the trial, all say that seeking the true place for the north-west corner of section 19, by pro rating the distance between the south-west corner of the town and the north-west corner of section 7, in proportion to the field note distances, would place that corner south of the Halderman corner; but they do not inform us how they reach this conclusion—whether by actual measurement, themselves, or by computation, made upon measurement made by one of them or by some other person; nor do they give any idea as to how far south of that corner such a survey would come, except Anderson, who says, "a little south of it." Two of these witnesses say that pro rating, in the same manner, the whole line from the north-west corner of the township to the south-west corner of the township, would also place the north-west corner of section 19 south of Halderman's corner, but fail to say how much.

Folson, another surveyor, says that pro rating the whole line would place the section corner north of the Halderman corner and south of the Noble corner; but he does not say how far from either corner, nor does he say upon whose measurement of the line his computation was made. Plainly, if these computations were all made upon one measurement, they ought not to differ in results. The correct measurement of the real distance being given, and with the same field notes before them, these surveyors could not well differ in the result of their computations.

The pro rating of the distance of five or six miles on the range line affords very slight evidence as to the position of the original corners. If no other means of locating them can be had, that plan may be resorted to as the fairest approximation, under such circumstances; but even in such cases, it is almost a certainty that corners thus established are not at the points where they were originally located, and the probability in such case is, that the corners most distant from terminal

points of the line pro rated will be placed by that process quite distant from the true corners. In cases like this, the indications from a pro rating process are far less reliable than the circumstantial evidence found in tracing the field note course from the known section corner next east, to a point where that course intersects the range line and that found in the measurement of the distance between the jog corners, and comparing that with the same length of the same line in the field notes.

The weight of evidence in this record seems, palpably, to indicate the Noble corner as the original section corner erected for the north-west corner of section 19.

The weight of evidence seems, also, to indicate that Paswaters, the grantor of Chrisman, (with as full knowledge as is now had of all the indications in favor of the Halderman corner,) permitted the defendant to make improvements on certain locations on his land, on the faith that Paswaters would never undertake to insist upon the Halderman survey as correct; which improvements Paswaters must have known the defendant would not have so located if he had been advised that, in certain contingencies, such a claim might be set up by Paswaters.

While this verdict may not be so palpably against the weight of the evidence as to make it proper to set it aside upon that ground, it is, to say the least, so questionable as to require that the rulings of the court, in the giving of the law to the jury, should be carefully scrutinized.

Appellant complains of the refusal of the court to give an instruction asked in his behalf, "that, in determining the issues in this case, they are not to take into consideration what may have been the result of any former suit in regard to the north line of section 19; that the verdict in such case is not in evidence, and has nothing to do with it." It is not denied by appellee that the proposition contained in the proposed instruction is sound, but it is insisted that it is irrelevant, and was unnecessary. We can not adopt this view. Howser had tes-

tified that, soon after the Halderman survey, made in 1856, he had built his fence on the section line, according to the Halderman corner, inclosing the land lying next north of that line.  Ira Merchant had sworn that, ever since "the trial between Chrisman and Jonathan Howser about the line between sections 18 and 19, he had surveyed from the Halderman corner as the corner for Randolph."  Folson had testified "he had heard Dr. Noble testify in the Chrisman and Howser suit about this section line."  Paswater testified that, "at first, we claimed to the Noble corner, but when our suit with Howser was decided, we claimed to the Halderman corner."  Spalding testifies that, "since the Howser suit, he has made surveys according to the Halderman corner, *supposing that it was settled by that suit.*"  Ela testified, "since that suit, I have taken the Halderman corner for Randolph and the Noble corner for Funk's Grove."

The jury were thus informed, incidentally, by the statements of witnesses, that there had been a former suit, in which the true location of the north line of section 19 had been brought in question, and that it had been decided in such manner that the surveyors and others thought it was settled that the Halderman corner was the government corner for Randolph and the Noble corner for Funk's Grove.  This had a strong tendency to lead the jury, unless otherwise instructed by the court to give much weight to the result of that trial, as an important fact in support of appellee's theory of the case. The instruction was proper, and, under the circumstances, was necessary.  It was error to refuse it.

Another question is presented in the record which demands attention.  Testimony was given in the case showing that Dr. Noble, at the time of the trial, was dead; that, in life, and from an early day, he was a surveyor, and was familiar with the landmarks relating to this boundary question, and that he had, at divers times, declared that the Noble corner was the original corner for section 19.  To the admission of this testimony plaintiff objected.  The court permitted the evidence to be

heard, but instructed the jury that "the declarations of Dr. Harrison Noble, after he became the owner of the land in controversy, were admitted in this case for the purpose of proving that he was claiming that the boundary line of his land was where his son, the defendant, fenced it, and *not for* the purpose of determining which is the true corner for Randolph township." This, we think, was erroneous. Dr. Noble entered the land, which is now that of the defendant, before 1851. The evidence does not fix the exact date, but it is not perceived that he could have had an interest to misrepresent the true location of the north-west corner of section 19 until after the improvements thereon were constructed and so located that it would be a detriment to the value of the property to have the lines located farther south. Being the owner of the south-west quarter of section 19 in, say, 1856, unoccupied and unimproved, it is not perceived that fact rendered it to his interest to have that tract located a few rods farther north or a few rods farther south. At that time there was no monument at the south-west corner of the section to limit the extent of his land on the south.

The American authorities, generally, concur in admitting as evidence, on questions of landmarks and boundaries, the declarations of deceased persons, made by them when they had peculiarly good means of knowledge on the subject in question —made when they had no interest in misrepresenting the truth. The declarations of Dr. Noble, made before the improvements alluded to were made, were competent evidence on the question whether the Noble corner was or was not the true corner for the north-west quarter of section 19.

The court also instructed the jury, in substance, that if, at the time when defendant built his fences, there was then *a controversy* as to whether the Halderman corner or the Noble corner was the true corner, then, so far as the question of estoppel is concerned, they should find for defendant.

Estoppel *in pais* rests upon the act of the party to be estopped, or some omission on his part to speak or act, by which some

supposed right of the party seems to be waived, in a case and under circumstances where some other party acts upon the faith of such act or omission, and changes his condition. It is not perceived how the fact that the matter was in controversy at the time could affect the question of estoppel, unless the nature of such controversy was such that it showed that it repelled the inference which the party claiming the estoppel is said to have acted upon. The estoppel rests, in all cases, upon the position that, under the circumstances, the party to be estopped ought to have acted differently, if he did not intend to waive his right. The circumstances must be such that good faith required him to do otherwise, if he was not willing that the other party should act upon the faith of the supposed waiver of his right.

We express no opinion upon the question, whether the facts are of a character to estop plaintiff or not. We simply rule that this instruction was wrong.

The judgment must be reversed, and the cause remanded for a new trial.

*Judgment reversed.*