EMANUEL MAYER

*v.*

FREDERICK ERHARDT.

1. ESTOPPEL—*from party's representations.* Where a party sells notes for the payment of which a vendor's lien is reserved in his deed, representing that all the other and prior notes have been paid, leaving those sold the only lien, he will be estopped from enforcing his lien as to a prior note against the purchaser, and the latter will have the first lien.

2. SAME—*by representations made in ignorance of facts.* Where a party makes a sale on the faith of his representations respecting the title, he will be estopped from asserting a right he may have to the prejudice of such purchaser, and his ignorance of the truth of his representations will not remove the estoppel, if such ignorance is the result of gross negligence.

3. NOTICE—*through other agents of same institution.* A director of a bank will not be allowed to plead ignorance of a transaction with the bank in order to avoid responsibility for the acts or omissions of himself or his agents, as against third persons. But when the rights of the bank are not involved, but only his individual rights as against another, he will not be held chargeable with notice of a transaction with the bank.

4. FORMER DECISIONS. It was not intended, in the case of *The People* v. *Brown et al.* 67 Ill. 435, to overrule the decision in the case of *Smith* v. *Newton*, 38 Ill. 230, in respect of an estoppel *in pais.* What is there said applies only to the facts of that case.

5. SAME—*obiter dictum.* It is a maxim that general expressions in an opinion are to be taken in connection with the facts of the case, and what is said by way of argument and beyond the case, though entitled to respect, is not authoritative in other cases.

APPEAL from the Circuit Court of Cass county; the Hon. CYRUS EPLER, Judge, presiding.

Mr. OSCAR A. DE LEUW, for the appellant.

Messrs. DUMMER, BROWN & RUSSELL, Mr. GARLAND POL-
LARD, and Mr. HENRY PHILLIPS, for the appellee.

Mr. CHIEF JUSTICE SCHOLFIELD delivered the opinion of
the Court:

On the 12th of May, 1872, Mayer sold certain real estate to
Maxwell for $10,000, of which $4800 was paid at the time,
and Maxwell gave Mayer his four promissory notes for the
residue, payable as follows: the first for $1000, March 1, 1873;
the second for $1500, March 1, 1874; the third for $2000,
March 1, 1875; and the fourth for $700, March 1, 1876;
and, to secure the payment of these notes, a vendor's lien was
reserved by Mayer in his deed-conveying the property to Max-
well, which was duly recorded.

The first note was paid at or near its maturity. On the 8th
of June, 1874, Mayer applied to Maxwell for payment of the
balance due on the second note, which, after deducting the
payment that had then been made, amounted to $975. Max-
well did not have the money, and he and Mayer then went to
the Cass county bank, from which Maxwell asked to obtain a
loan of the amount. The cashier of the bank, being the person
to whom the application was addressed, offered to let him have
the money on condition that Mayer would sign his note, and
that he would also leave the $1500 note from himself to
Mayer as collateral security. This condition was accepted.
Maxwell and Mayer made their note to the bank for $975,
payable in ninety days. The $1500 note was deposited with
the bank as collateral security for its payment, and the bank
paid Maxwell the $975, which he immediately paid over to
Mayer. In this transaction, as between Mayer and Maxwell,
there is no question but that the $975 was a loan to Maxwell
to enable him to pay Mayer the balance due on the $1500
note, and that Mayer was his surety only for its repayment to
the bank.

On the 13th of May, 1875, Mayer applied to Erhardt to sell to him the third and fourth of the Maxwell notes (being for $2000 and $700 respectively) and represented to him that they were secured by a lien on the property he had conveyed to Maxwell, reserved in the deed; that all the other notes had been paid, and that these only were a lien upon the land, which was good security for their payment. Relying on these representations, Erhardt bought the notes, paying Mayer therefor the amount due upon them, less a discount of $132, and Mayer indorsed and assigned them to him without recourse.

In January, 1876, the bank notified Mayer by letter, written by its cashier, that the note given by him and Maxwell to the bank for the $975 had not been paid; that the bank held him as a joint and several maker of the note with Maxwell, and that unless payment should be made within ten days, by order of the board of directors, the note and the $1500 note of Maxwell to Mayer, held as collateral security for its payment, would be sold. Mayer thereupon paid off the $975 note, and took up the $1500.

Erhardt was a director in the bank during all this time, and was generally present at all the meetings of the board. At such meetings the cashier makes report embracing the assets and liabilities of the bank, and this includes collaterals held by the bank; but Erhardt denies actual knowledge that this $1500 note was held as collateral security by the bank until in January, 1876, and in this he is corroborated by the testimony of the cashier of the bank, and there is no countervailing proof upon this point.

Mayer, having taken up the $1500 note, filed his bill in chancery in the court below, making Maxwell, Erhardt and others defendants, praying a sale of the premises conveyed by him to Maxwell for its payment. Erhardt, after answering this bill, filed his cross-bill, praying that he have a prior lien on the property for the payment of the two notes assigned to him over any lien in favor of Mayer, and that the property be sold, etc.

The court below found that Erhardt was entitled to the prior lien, and decreed the relief sought by his cross-bill.

We do not, under the evidence before us, conceive that the fact that Erhardt was a director in the bank, has any material bearing on the questions to be decided. If the matter in controversy affected the business of the bank or its management, it is clear that Erhardt could not be heard to say that he had no knowledge on the subject. Public policy forbids that one who holds himself out to the world as the director or manager of an institution, should, when sought to be made liable by creditors or the people, in a proper proceeding, be allowed to avail of the plea of ignorance in order to avoid responsibility for the acts or omissions of himself or his agents.

But the question here has nothing to do with the conduct of the bank or its officers, but relates solely to a private transaction between two individuals in which the bank has not the slightest imaginable interest, although one of them happened, at the time, to be a director in the bank.

But, suppose we shall say Erhardt is chargeable with knowledge of the transaction between Mayer and Maxwell on the one part, and the cashier, representing the bank, on the other part; that he must be held to have known that the $1500 note was deposited with the bank as a collateral security for the payment of the $975 note of Mayer and Maxwell, is he also chargeable with knowledge that Maxwell has not secured or will not, in some way, secure, other than by the $1500 note, Mayer against loss on that account? We think not. A surety may, certainly, contract to release collaterals, or even do so voluntarily, and when he makes declarations assuming that he has done so, we can perceive no reason why he should ordinarily be disbelieved. Nor do we perceive that those contracting with him in regard to property that might be affected by his action in that respect, should be required to use more caution and circumspection than when dealing with him in regard to property not liable to be thus affected.

It does not appear, from the evidence in the abstracts before

us, that, when Mayer represented to Erhardt all the notes given him by Maxwell for the property he sold him, and secured by a lien reserved in his deed to Maxwell, were paid except the last two, he was unmindful of the fact that the second or $1500 note was then on deposit with the Cass county bank as a collateral. He does not say so in his evidence, although this is set up in his unsworn answer to Erhardt's cross-bill; and it is not otherwise proved.

But if we shall concede that he had, for the time, forgotten this circumstance, can it avail him? He knew that Erhardt was purchasing on the faith of his representations, or at least he should have so known. The land or property on which the notes were secured is shown to not have been worth above $3000, and the inference from all the evidence is, that, aside from his interest in the land, Maxwell was insolvent. The price paid assumed that the notes were well secured; and hence, he received money which he would not have received, but for the representations he made. The second, or $1500, Maxwell note, was payable to him. He had made no assignment of it save as collateral for the note on which he and Maxwell were joint and several payors to the bank. He knew when that note was due, and it was as much his legal duty as that of Maxwell to see that it was paid when due. A very low degree of diligence and capacity in his affairs, it would seem, would have enabled him to have kept these things in mind; and to say that he did not do so, would, in our opinion, amount to a confession that he was grossly negligent.

In *Smith* v. *Newton,* 38 Ill. 230, where Smith made representations in regard to the state of his title, upon the faith of which Newton purchased certain notes, it was said, " The statements of the defendant in error caused the purchase of the notes by the plaintiff in error, and equity demands he shall not now urge any defect in the title to the injury of that purchaser. It is immaterial whether the defendant in error knew the state of title or not. He ought to have known it to be good, to have justified him in giving to the plaintiff in error

the assurances he did.  *   *   *  If an equitable estoppel can
be made out, it has been established in this case." And this
is believed to be in accordance with the weight of the modern
authorities on the question. "It seems," says Bigelow, in his
work on Estoppel, (1st Ed.) p. 540, " to be settled that a party's
ignorance of the truth of the representation made will not re-
move the estoppel, if his ignorance is the result of gross neg-
ligence." In support of this, he cites the following, which
will be found to sustain the text: *Calhoun* v. *Richardson*, 30
Conn. 210, *Preston* v. *Mann*, 25 id. 118, *Sluir* v. *Croucher*, 1
De G. F. & J. 518, *Smith* v. *Newton, supra.*

It was not intended, in *The People* v. *Brown et al.* 67 Ill.
435, to overrule *Smith* v. *Newton, supra.* What is there said is
a mere statement of the general doctrine, so far as applicable
to the facts then under consideration, without pretending to
give the exceptions existing under particular states of case not
then within the consideration of the court. It is based upon
the work of Bigelow, before referred to, and had it been in-
tended that it should be understood as excluding all possible
exceptions, our express disapprobation of so much of the text
as is above quoted from Bigelow's work, would have followed,
and *Smith* v. *Newton* declared overruled. Nor has this court,
in any other case, overruled *Smith* v. *Newton*, although there
may be many times found a general statement of the doctrine
of estoppel *in pais* omitting reference to what is there ruled.

And here we may appropriately quote from the opinion of
Judge MARSHALL, in *Cohens* v. *Virginia*, 6 Wheaton, 399 :
" It is a maxim not to be disregarded, that general expres-
sions, in every opinion, are to be taken in connection with the
case in which those expressions are used. If they go beyond
the case, they may be respected, but ought not to control the
judgment in a subsequent suit when the very point is presented
for decision. The reason of this maxim is obvious. The
question actually before the court is investigated with care,
and considered in its full extent. Other principles which may
serve to illustrate it, are considered in their relation to the

case decided, but their possible bearing on all other cases is seldom completely investigated."

The present case is fully as strong, in the facts and circumstances justifying the application of the equitable doctrine of estoppel *in pais,* as that of *Smith* v. *Newton, supra,* and we are clearly of opinion that the decree below is authorized by the evidence under the law. The decree is affirmed.

*Decree affirmed.*